# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 94-CA-00948-SCT

*PAT SPARKS, INDIVIDUALLY AND ON BEHALF OF THE HEIRS AT LAW AND WRONGFUL DEATH BENEFICIARIES OF WILL HOLMES, DECEASED, AND KIMBERLY TAYLOR, A MINOR, BY AND THROUGH CATHY TAYLOR, HER NATURAL MOTHER AND GUARDIAN*

*v.*

*MYUNG KIM, JUAN SANTOS, JOHN DIAL, JOHN BERRY, WILLIAM TUMLINSON, MEDICAL DOCTORS; JOHN DOE, BETTY DOE, RICHARD ROE, UNKNOWN MEDICAL DOCTORS, NURSES, OFFICERS AND/OR EMPLOYEES OF MISSISSIPPI DEPARTMENT OF CORRECTIONS; LEROY BLACK, COMMISSIONER OF MISSISSIPPI DEPARTMENT OF CORRECTIONS; AND STEVE PUCKETT, INDIVIDUALLY AND A SUPERINTENDENT OF THE MISSISSIPPI STATE PENITENTIARY*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/23/94 |
| TRIAL JUDGE: | HON. EUGENE M. BOGEN |
| COURT FROM WHICH APPEALED: | SUNFLOWER COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | ELLIS TURNAGE |
| ATTORNEY FOR APPELLEES: | JOHN L. CLAY |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 11/13/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 12/4/97 |

**EN BANC.**

**PRATHER, PRESIDING JUSTICE, FOR THE COURT:**

## I. STATEMENT OF THE FACTS AND CASE

¶1. Will Holmes, an inmate in the custody of the Mississippi Department of Corrections, died of meningitis at Parchman Hospital on November 18, 1991. He became ill on November 7, 1991 and

was allowed by the prison doctors to absent himself from work. Holmes was given Tylenol and other relatively minor treatments, which failed to improve his condition. Holmes was taken to Parchman hospital on November 15, 1991 and again on November 18, 1991, where he died that evening.

¶2. Holmes' wrongful death beneficiaries and heirs at law, Pat Sparks, individually and on behalf of the heirs at law and wrongful death beneficiaries of Will Holmes, deceased and Kimberly Taylor, a minor, by and through Cathy Taylor, her natural mother and guardian, filed suit in the Sunflower County Circuit Court on November 18, 1993. The suit sought both compensatory and punitive damages against Myung Kim, Juan Santos, John Dial, John Berry, William Tumlinson, medical doctors; John Doe, Betty Doe, Richard Roe, unknown medical doctors, nurses, officers and/or employees of Mississippi Department of Corrections; Leroy Black, Commissioner of Mississippi Department of Corrections; and Steve Puckett, Individually and a Superintendent of the Mississippi State Penitentiary who were prison doctors and other prison medical personnel and also named as defendants Leroy Black, Commissioner of the Mississippi Department of Corrections, and Steve Puckett, Superintendent of the Mississippi State Penitentiary.[1]

¶3. On July 18, 1994, Myung Kim, Juan Santos, John Dial, John Berry, and Steve Puckett filed a motion to dismiss, or in the alternative, a motion for summary judgment, raising the defenses of "qualified, absolute, official and sovereign immunities." The Circuit Judge, finding that Miss. Code Ann. § 11-46-9 provided immunity to the defendants, granted the motion to dismiss on August 23, 1994. Sparks timely filed an appeal from said ruling.

## II. LAW

¶4. Will Holmes died in 1991. Sparks' beneficiaries therefore assert that the circuit court erred in basing its order of dismissal upon the 1993 amendments to Miss. Code Ann. Section 11-46-1 et. seq., most particularly those made to § 11-46-9(1)(m). Section 11-46-9(1)(m) effectively cuts off a prison inmate's right to bring a negligence or wrongful death action against the State or its employees, but no such statute was in effect at the time the present cause of action arose.

¶5. Kim and the other appellees argue, however, that the Legislature has expressed an intent that the 1993 amendments to this State's sovereign immunity statutes be applied retroactively. Specifically, Kim cites Miss. Code Ann. § 11-46-3(1), which provides in part that:

> (1) The Legislature of the State of Mississippi finds and determines as a matter of public policy and does hereby declare, provide, enact, and reenact that the "state" and its "political subdivisions," as such terms are defined in Section 11-46-1, are not now, have never been and shall not be liable, and are, always have been and shall continue to be immune from suit at law or in equity . . . .

Kim argues that "the language of this statute is clear that legislative sovereign immunity shielded these Defendants from tort liability for negligent acts committed even before the passage date of this act."

¶6. This Court agrees with Sparks that the trial judge erred in dismissing the lawsuit based on a retroactive application of Miss. Code Ann. § 11-46-9(1)(m). Section 11-46-9 clearly states that it is effective from and after its passage, and the statute indicates that paragraph (m) was rewritten in

1994. It is also clear that state prison doctors and other prison medical personnel were not protected by the doctrine of sovereign immunity as it existed in 1991 because, at that time, sovereign immunity did not provide protection to individuals, but rather to the State and its political subdivisions.[(2)] The statement of legislative intent in Miss. Code Ann. § 11-46-3(1) is thus inapplicable to the present suit against doctors and other medical personnel, none of whom are properly considered to constitute the "state" or its "political subdivisions."

¶7. After careful consideration, however, this Court concludes that prison doctors and other prison medical personnel such as those involved in the present suit should be protected by qualified public official immunity and that this Court's decision in *Womble v. Singing River Hospital*, 618 So.2d 1252 (Miss. 1993) should not be extended to situations involving medical treatment decisions made by doctors working in the jails and prisons of this State. In *Womble*, this Court overruled then-existing Mississippi law which held that physicians engaged in the public service are qualifiedly immune from suit for medical treatment decisions made during the course of that service. Thus, prior to *Womble*, the plaintiffs in the present case would have been barred from suing the defendants herein under state law based upon authority such as *Marshall v. Chawla*, 520 So.2d 1374 (Miss. 1988) and *Hudson v. Rausa*, 462 So.2d 689 (Miss. 1984), both of which were overruled by this Court in *Womble*.[(3)]

¶8. A review of the rationale for this Court's holding in *Womble* indicates that said rationale is not applicable to doctors working in prisons and jails. The first rationale offered by this Court in support of the holding in *Womble* is that:

> None of these considerations undergirding common law qualified immunity are applicable to medical treatment decisions. First of all, there is nothing inherently governmental about decisions regarding individual medical treatment. They do not involve the formulation of public policy in any respect. Therefore, the notion of promoting governmental decisions that are in the public good is completely inapplicable.

*Womble* at 1263. The medical treatment afforded to prisoners involves governmental and public policy considerations to a greater degree than similar treatment issues involving non-inmates. Doctors working in state hospitals are not able to view their inmate patients as mere medical patients, but they must also view them as security risks whose treatment also involves considerations unrelated to medical necessities. The medical needs of prisoners must inevitably be weighed in the context of concerns regarding security, the sound and orderly administration of the prison, and the funding for said services provided by the government. This Court is aware that prisoners are entitled to adequate medical treatment, but the providing of this treatment involves additional considerations in the prison context.

¶9. The second rationale advanced by this Court in *Womble* is that:

> The fact that a physician or other medical provider is employed by the State does not expose that physician to any greater threat of suit than he would otherwise face in private practice. He therefore will be no more discouraged by the threat of suit from taking actions he thinks are prudent, than he ordinarily would be as a private physician. Furthermore, the threat of suit will not discourage physicians from seeking and accepting government employment, because they will face the exact same potential exposure to liability that they would as private physicians.

*Id.* at 1263-64. It is likely that permitting lawsuits against prison doctors and other prison medical personnel would adversely affect the ability of prisons to hire competent personnel, and that the prisoners themselves would suffer from such a development. It is clear that the immunity granted to doctors working in public hospitals prior to *Womble* was based in large measure upon public policy, including the policy in favor of encouraging doctors and other medical personnel to work in public facilities which traditionally found it difficult to hire competent personnel. This Court considers this consideration to be an important one in the context of the prison, which clearly does not offer the most desirable working environment for a doctor.

¶10. This consideration is closely related to the third and final rationale advanced by this Court in *Womble*:

> Finally, the judicial system is perfectly capable of adjudicating the reasonableness of medical treatment decisions. Our courts do it every day in medical malpractice actions across this state. The medical treatment decisions made by medical personnel at state health institutions are no different from the private medical care decisions that are currently being judged.

*Id.* at 1264. It should be apparent that there are serious public policy arguments against granting inmates access to yet another outlet for the exercise of creative litigation. The members of this Court need not be reminded of the number of lawsuits filed by prisoners every day and it can not be validly argued that a prison doctor would be at no greater risk of having to defend against lawsuits than one working in the private sector.

¶11. Granting qualified immunity to prison doctors and other medical personnel may bar some meritorious non-federal[4] lawsuits on the part of prisoners, but this Court concludes that the cumulative effect of granting this immunity will be a positive one. This Court's decision today does no more than reapply in the prison context the law which was applicable to public doctors as a whole for years. The result urged by Sparks would create a brief window of opportunity for prisoners to file lawsuits against prison doctors and other medical personnel even though no such recourse was available prior to *Womble* and none is available under current law. It is true that the passage of § 11-46-9(m) (Supp. 1994) will curtail the filing of civil lawsuits by prisoners against public officials for incidents arising after the effective date thereof, but this Court concludes that the public policy considerations which motivated the Legislature to pass this measure should be implemented in the present case as well.

¶12. This Court therefore holds that the long-standing law of qualified immunity as set forth in the *Hudson/Marshall* cases has continued applicability with regard to prison doctors and other prison medical personnel. To the extent that the Legislature has enacted its own statutory provisions limiting the ability of prisoners to file lawsuits such as the present one, said statutory law is, of course, controlling from and after the effective date thereof. *Womble* did not make any specific holding with regard to prison doctors, but to the extent that the holding therein might be considered applicable to prison doctors and other prison medical personnel, that decision is limited and distinguished from the present context.

¶13. Given that the present suit arose before the effective date of § 11-46-9(m)(Supp. 1994), this Court must consider the appeal from the trial judge's 12(b)(6) ruling in the context of the qualified

immunity law set forth in ***Hudson/Marshall*** and reenacted in a limited context herein. The immunity set forth in ***Hudson/Marshall*** is not absolute, but only qualified. This Court noted in ***Hudson*** that:

> The public officials of this state, elected or appointed, enjoy a qualified immunity to a civil action for damages . . . (t)hey lose this immunity only when they substantially exceed their authority and commit wrongs under color of office They have no immunity when they commit willful wrongs or malicious acts. (citations omitted).

***Hudson***, 462 So.2d at 696.

¶14. A motion to dismiss pursuant to M.R.C.P. 12(b)(6) raises an issue of law. When considering a motion to dismiss, the allegations made in the complaint must be taken as true and the motion should not be granted unless it appears beyond doubt that the plaintiff will be unable to prove any set of facts in support of his claim. ***T.M. v. Noblitt***, 650 So.2d 1340, 1342 (Miss. 1995).

¶15. Accepting the facts in the complaint as true, it appears that the present case involves a tragic mid-diagnosis of the severity of Holmes' condition with possible negligence on the part of some or all of the medical personnel involved. The complaint alleges that various physicians named in the complaint immediately permitted Holmes to be released from work following his manifestation of symptoms. The complaint further asserts that Holmes was treated with cold, sinus, and pain medication on November 12 and admitted to the hospital on November 15, where a shot was administered. The complaint asserts that Holmes was given "2 tylenol tablets" on November 17 and was admitted to the hospital the following day, where he died.

¶16. Accepting these facts as true, there is no indication that the defendants in the present case either exceeded their authority or committed "willful wrongs or malicious acts" as set forth in ***Hudson*** as a pre-requisite for recovery against the qualifiedly immune defendants. The facts of the present case as set forth in the complaint are, rather, consistent with the doctors and other personnel failing to realize the severity of the patient's illness. Holmes was immediately released from work duties and provided with medical attention for his illness. The fact that the treatment was inadequate for the severity of his condition does not indicate that the doctors in question committed "willful wrongs or malicious acts" nor that their actions resulted from anything other than a mis-diagnosis of the meningitis.

¶17. This Court therefore concludes that the present suit against the defendants is barred by the doctrine of qualified immunity, and the trial judge's dismissal of the present cause of action is affirmed.

¶18. **JUDGMENT IS AFFIRMED.**

**LEE, C.J., ROBERTS, MILLS AND SMITH, JJ., CONCUR. BANKS, J., DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., PITTMAN AND McRAE, JJ. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND PITTMAN, J.; BANKS, J., JOINS IN PART.**

**McRAE, JUSTICE, DISSENTING:**

¶19. The majority correctly finds that the circuit court erred in dismissing Sparks' case based on the "retroactive" application of Miss. Code Ann. § 11-46-9(m). However, I disagree with its conclusion that our decision in *Womble v. Singing River Hospital,* 618 So. 2d 1252 (Miss. 1993) is not applicable to doctors and other medical personnel working in the state penal system and its reasons for so finding. Further, the majority fails to address the charges Sparks raised against the Commissioner of Corrections and the Superintendent of the State Penitentiary.

¶20. Prisoners are human beings entitled to basic fundamental rights. The doctors and medical personnel to whom their care is entrusted should not be given a license of indifference to maim or kill. Accordingly, I dissent.

I.

¶21. Will Holmes, an inmate in the custody of the Mississippi Department of Corrections, died of meningitis at Parchman Hospital on November 18, 1991. He became ill on November 7, 1991. On November 9, 1991, he was denied emergency medical treatment because it was a weekend. Again, on Monday, November 11, 1991, when one eye was swollen shut, he was denied medical treatment because it was a State holiday. As his condition worsened over the next few days, he was treated with Tylenol and a shot by personnel at the prison hospital and sent back to his unit. Affidavits from fellow inmates indicate that the guards in his unit repeatedly sought to get emergency medical treatment for him as his illness progressed. By November 17, though desperately ill, the prison guards were advised merely to give him Tylenol and told that he would be taken to the prison hospital the next day. Holmes finally was transported to Parchman hospital on November 18, 1991, where he died that evening.

II.

¶22. While the majority indicates its agreement with Sparks that the circuit court erred its "retroactive application" of Miss. Code Ann. § 11-46-9(m), it neglects to point out that both art. I, § 10 of the United States Constitution and art. III, § 16 of the Mississippi Constitution prohibit *ex post facto* laws. *Estate of Stamper v. Stamper,* 607 So. 2d 1141, 1148 (Miss. 1992); *Ferguson v. Ferguson,* 639 So. 2d 921, 943 (Miss. 1994)(McRae J., concurring in part, dissenting in part). *See also Churchill v. Pearl River Basin Dev. Dist.*, 619 So. 2d 900, 904 (Miss. 1993)(statute enacted in 1984 and applicable to causes of action accruing after 1987, was not applicable *after* Churchill's 1981 injury). As this Court stated in *Moore v. Molpus*, 578 So. 2d 624, 643 (Miss. 1991), "[w]e take it as an article of faith and law that *ex post facto* laws are bad practice." The United States Supreme Court further has explained the *ex post facto* clause of the United States Constitution as providing assurance that legislative enactments "give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed" and to "restrict . . . governmental power by restraining arbitrary and potentially vindictive legislation." *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981) (footnote and citations omitted).

III.

¶23. I disagree with the majority's position that this Court's decision in *Womble v. Singing River Hospital,* 618 So. 2d 1252 (Miss. 1993) should not be applied to doctors and other medical personnel employed by our prisons and jails. In *Womble,* we stated:

> we hold that common law public qualified official immunity will be restricted to its designed purpose. Accordingly, it will not be extended to decisions that involve only individual medical treatment. Those decisions will be judged on the same standards as if made by private providers.

*Womble,* 618 So. 2d. at 1265 (overruling *Hudson v. Rausa,* 462 So. 2d 689 (Miss. 1984) and *Marshall v. Chawla,* 520 So. 2d 1374 (Miss. 1988) to the extent that they provided immunity against medical malpractice actions against state-employed doctors). As we explained in *Womble,* there is nothing inherently governmental about a doctor's medical treatment decisions and thus, a physician employed by a public hospital is no more at risk of suit than one in private practice. *Id.* at 1264. Similarly, in *Sullivan v. Sumrall*, 618 So. 2d 1274 (Miss. 1993), we found that qualified immunity did not protect from suit a nurse employed by a community hospital. There, the Court stated that

> we hold that there is no qualified immunity for any public hospital employees making treatment decisions. Discretion exercised by medical personnel in making the treatment decisions is not the sort of individual judgment sought to be protected by the qualified immunity bestowed upon public officials.

*Sullivan,* 618 So. 2d at 1276-77.

¶24. The majority's reasoning for finding *Womble* inapplicable in the prison context is confounding to say the least. While the opinion acknowledges that this Court is *aware* that prisoners are entitled to adequate medical treatment, by this ruling, it apparently does not *believe* that they are so entitled. To suggest that "security risks" might color a decision regarding medical treatment is an affront to those doctors who are committed to upholding the tenets of the Hipprocratic oath. Doctors, like attorneys and other medical personnel who serve the prison population, are expected to exercise the same level of professional care as those who serve the general population. Furthermore, as applied to the case *sub judice*, the notion that the gravely ill Holmes posed a security risk which might have affected any decision regarding his medical treatment is ludicrous.

¶25. I further find little credence in the majority's argument that because prisons do not offer "the most desirable working environment for a doctor," there is a need to foster policies, such as immunity from lawsuits by inmates, that will encourage competent doctors and other medical personnel to seek work there. Is the working environment of a prison any less "desirable" than a poor rural clinic or an urban emergency room? Just as some physicians are "called" to the rarified atmosphere of the research institute, still others are "called" to serve in the nitty gritty of a street clinic or prison hospital.

¶26. The majority's argument that extending *Womble* to doctors and medical personnel employed by prison hospitals will serve as "yet another outlet for the exercise of creative litigation" likewise is not

compelling. Where the failure of the prison hospital system is so egregious as to deprive an individual in State custody "of any rights, privileges, or immunities secured by the Constitution and laws," he, thank goodness, already may seek redress in federal court pursuant to 42 U.S.C. § 1983. Our system of justice should be able to handle the needs of our State without leaving them to someone else.

IV.

¶27. Except in a footnote, the majority does not address Sparks' charges against prison officials. Sparks asserts that the failure of the Commissioner of Corrections and the Superintendent of the State Penitentiary "to correct systemic deficiencies in the administration of medical services and their failure to provide inmates with serious medical condition[s] access to medical personnel on weekends, state holidays and in emergency medical situations" caused or contributed to Holmes' death. Miss. Code Ann. § 47-5-23 (Supp. 1988) provides that the Commissioner "shall be responsible for the management of affairs of the correctional system and for the proper care, treatment, feeding, clothing and management of the offenders confined there . . ." Further, the Superintendent "shall be directly responsible to the commissioner for the performance of the daily operation of the Parchman facility including but not limited to, functions relating to administrative services and community services at Parchman." Miss. Code Ann. § 47-5-26 (5) (Supp. 1988).

¶28. The Department of Corrections' own policy and procedure statement, effective May 15, 1991, requires that inmates be provided with twenty-four hour a day emergency medical care, as well as with transportation to contract hospitals for emergency medical treatment on a twenty-four hour basis. Affidavits submitted by Sparks indicate that Holmes was desperately ill for several days before his death and that emergency treatment was not provided despite numerous requests for same by officers in his Unit. Treatment was refused at various times because of a weekend and a State holiday. By its failure to address the alleged violations of the Department's own policies and procedures as well as its statutory directives, the majority makes light of the responsibility of prison officials to the welfare of prison inmates.

¶29. When considering a motion to dismiss, the allegations made in the complaint must be taken as true and the motion should not be granted unless it appears beyond doubt that the plaintiff will be unable to prove any set of facts in support of his claim. *T.M. v. Noblitt,* 650 So. 2d 1340, 1342 (1995); *Overstreet v. Merlos*, 570 So. 2d 1196 (Miss. 1990); *DeFoe v. Great Southern National Bank*, 547 So. 2d 786 (Miss.1989); *Comet Delta, Inc. v. Pate Stevedore Co. of Pascagoula, Inc*., 521 So. 2d 857 (Miss.1988). Given that the allegations in the complaint must be regarded as true and that there are facts in the record supporting the claims made, the motion to dismiss to dismiss Sparks' claims should not have been granted.

¶30. For all of these reasons, I do not join the majority opinion.

**SULLIVAN, P.J., AND PITTMAN, J., JOIN THIS OPINION. BANKS, J., JOINS IN PART.**


**BANKS, JUSTICE, DISSENTING IN PART:**

¶31. I am startled at today's decision of this Court to expand the qualified immunity of public officers to envelop the routine medical decisions of public doctors in their treatment of this State's prisoners.

This Court's decision is predicated entirely upon the propensity of prisoners to file lawsuits. Surely, this court can deal with any frivolous prisoner medical malpractice suits in another, more reasonable manner. Just as surely, non-frivolous suits should be allowed to proceed. This court instead dons its legislative cap and adopts a course that runs afoul of the proper interpretation of our history of public official immunity.

¶32. Contrary to the majority's assertion that it is returning to the rule which prevailed for "years," this distinctly minority rule was first suggested in dicta in *Hudson v. Rausa*, 462 So. 2d 689 (Miss. 1984). It was later adopted in *Marshall v. Chawla*, 520 So. 2d 1374 (Miss. 1988). Our holding in *Marshall* was a misstep which lasted a mere five years. *See Womble v. Singing River Hospital,* 618 So. 2d 1252, 1264-65 (Miss. 1993). None of these cases offer in their support a single Mississippi authority which purports to extend qualified public official immunity to the medical treatment decisions of public health care workers. In *Hudson,* the defendants had duties which encompassed both non-medical public policy as well as medical treatment. The court opined that the treatment in question was inextricably bound to the policy initiative, and further stated in dicta that medical treatment is an exercise of discretion. This Court did not supply any authority for the implied conclusion that all medical treatment decisions could enjoy a qualified immunity. *See Hudson*, 462 So. 2d at 695-96 In *Marshall,* where only medical treatment was involved, this Court felt bound by the *Hudson* dicta, even though it recognized that few other jurisdictions followed that rule. *Marshall*, 520 So. 2d at 1375-76. It offered up as an excuse for this departure from the common law, the distinctly legislative concern that immunity might attract more physicians to public service. *Id.* at 1376.

¶33. It is readily apparent, at least to me, that the legislature has ample means to attract physicians into public service. These means include (but are by no means limited to) medical school loans and grants tied to public service, provisions for higher salaries and better working conditions, and the payment of malpractice insurance premiums. Given the precious life-saving (and life-threatening) powers wielded by doctors of medicine, and given the relative powerlessness of those who are ill and in need of medical care, offering immunity to public health physicians from liability for their negligence is a poor choice for a legislature in attaining this goal. Moreover, such immunity would likely violate the constitution.[(5)] It is totally improper as a rationale for this Court's interpretation of law.

¶34. The majority's reliance on the fact that injured prisoners who are treated by public physicians may file malpractice claims is, in my view, an equally unpersuasive reason to extend immunity from liability to purely medical decisions. The plain fact is that medical treatment decisions rendered with regard to prisoners is no more a matter of public policy than such decisions are anywhere else. Treatment is always affected by the conditions attendant to the patient's environment. It is the duty of the physician to prescribe that which his sound medical judgment dictates, or such alternatives as are possible under the limitations of the environment. Total immunity for these *medical* decisions is simply unnecessary to the goal of limiting frivolous complaints, and is not a rational response to those other non-medical concerns.

¶35. I see no reason whatever for retreating from what we said in *Womble,* and reiterated in *Sullivan v. Sumrall*, 618 So. 2d 1274 (Miss. 1993). What we said there is in agreement with the vast majority of authority in our nation and in keeping with the true purpose of our common law tradition of public

official immunity, that it be provided where necessary to protect the government's capacity to perform its traditional functions.

**SULLIVAN, P.J., PITTMAN AND McRAE, JJ., JOIN THIS OPINION.**

1. Later pleadings clarify that the plaintiffs sued Black and Puckett in their official capacities so as to seek prospective declaratory and injunctive relief.

2. Current law, however, provides that "no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties." See: Miss. Code. Ann. § 11-46-7(2) (Rev. 1993). Effective from and after passage.

3. Justices Lee and Roberts wrote in opposition to the overruling of these cases in a special concurrence on denial of rehearing in *Womble*. *Id.* 618 So.2d at 1269. Justices Lee and Roberts expressed the view that *Hudson* and *Marshall* constituted sound law, and that, instead of overruling these cases, the Court should instead distinguish *Womble* given that the doctors involved in *Womble* were not actually public doctors. In the present case, there is no doubt that the doctors involved are public doctors, given that they are all employees of the Mississippi Department of Corrections.

4. This Court's opinion does not, of course, affect whatever federal law remedies a prisoner might have.

5. Although this issue is not presently before the Court, it appears to me that the provision in Section 24 of our Constitution that insists that the courts shall be open and that a citizen will not be allowed to suffer a wrong without a remedy necessarily means that actions which were allowed at common law should not be removed so as to preclude an injured party of his common law remedy. Indeed, it may be permissible as a matter of constitutional interpretation for this court to reaffirm (and for the legislature to coextensively reenact) immunities that existed at common law prior to the adoption of Section 24. However, it seems plain to me that this Court may not extend qualified immunity to governmental actions which were not immunized at the time of the adoption of Section 24. *See Wells v. Panola County Bd. of Educ.,* 645 So. 2d 883, 890-92 (Miss. 1994) (noting that Remedies Clause is not abrogated by immunities that were *well-established* at time of Clause's adoption); *Robinson v. Stewart,* 655 So. 2d 866, 869 (1995) ("As the ultimate interpreter of the Mississippi Constitution, this Court holds that it is the legislative branch's prerogative to address limitations upon suits against government entities"). I am unable to find an occasion prior to the adoption of Section 24 where this court has even hinted at an immunity for medical treatment decisions of public doctors. Accordingly, in my view, today's creation of such an immunity now (with no corresponding benefit to the injured person whose remedy is adversely affected) is constitutionally problematic.