Revised May 14, 1999

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-60083

_____

BESSIE STEWART; PEARL STEWART GROSS,
individually and as administratrix of the estate
of Eugene Stewart; EDWARD STEWART; HENRIETTA STEWART
REED; PAUL E. STEWART; KELLY STEWART; EUGENE STEWART, JR.,

Plaintiffs-Appellants,

versus

STEWART MURPHY; ED HARGETT; RICHARD KNUTSON, Dr.;
STANLEY RUSSELL; MYUNG KIM, Dr.; JOHN DIAL, Dr.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Mississippi

_____

April 27, 1999

Before REYNALDO G. GARZA, POLITZ, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

For this 42 U.S.C. § 1983 action arising out of the death of
Eugene Stewart, an inmate in the Mississippi Department of
Corrections (MDOC), Appellants challenge an adverse summary
judgment, claiming material fact issues for whether, in violation
of the Eighth Amendment, three of Stewart's treating physicians and
the medical director at the prison hospital were deliberately

indifferent to his serious medical needs, resulting in his death. We **AFFIRM**.

## I.

This action centers on the treatment provided Stewart, from August 1994 until his death four months later, for decubitus ulcers (commonly known as bedsores), which ultimately caused his death. Appellants also made claims in district court against MDOC officials Murphy and Hargett. As indicated in Appellants' brief, as well as conceded by their counsel at oral argument, Appellants have abandoned their claims against these two officials and contest only the summary judgment awarded Drs. Knutson, Russell, Kim, and Dial.

Appellants filed this action in November 1996, presenting § 1983 claims against the two MDOC officials and Drs. Knutson and Russell. The parties consented to the case being referred to a magistrate judge. After conducting discovery, Appellants added Drs. Kim and Dial as defendants.

In their answer, Appellees raised immunity defenses, including sovereign and qualified immunity. Contending that Appellants' pleading lacked specificity, Appellees moved the district court to require a more specific response to the immunity defenses. Appellees based this motion on *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995) (en banc), in which this court stated: "When a public official pleads the affirmative defense of qualified

immunity in his answer, the district court may, on the official's motion or on its own, require the plaintiff to reply to that defense in detail". *See also* **Baker v. Putnal**, 75 F.3d 190, 195 (5th Cir. 1996).

The district court denied the motion, ruling that the original and amended complaints were "fact specific"; and that "[a]ny further clarification can be obtained through discovery". Appellees do not challenge this ruling on appeal, although they continue to assert that Appellants' complaint failed to plead an Eighth Amendment claim sufficiently.

In December 1997, Appellees moved, pursuant to FED. R. CIV. P. 12(b)(6), to dismiss the complaint for failure to state a claim. As a result, although the magistrate judge then questioned the specificity of the complaint, he noted that, in the year since it had been filed, the "somewhat inadequate allegations [in the complaint] have now been considerably fleshed out by discovery". Accordingly, in the interest of efficiency, the magistrate judge considered the evidence developed through discovery and treated the motion as one for summary judgment, rather than striking the complaint and requiring Appellants to refile.

The magistrate judge held that Appellants failed to show the requisite subjective knowledge and deliberate indifference by Appellees. He noted that, although Appellants may have shown negligence, "there is no evidence that [Stewart] was deliberately

ignored or maltreated or that the defendants committed willful wrongs or malicious acts". Therefore, this action was dismissed with prejudice.

## II.

### A.

The motion to dismiss for failure to state a claim was properly treated as one for summary judgment. *See* FED. R. CIV. P. 12(b) ("If, [on a 12(b)(6) motion to dismiss], matters outside the pleading are presented to and not excluded by the court, the motion *shall* be treated as one for summary judgment and disposed of as provided in Rule 56" (emphasis added)); ***Carter v. Stanton***, 405 U.S. 669, 671 (1972); ***Baker***, 75 F.3d at 197 ("... where a district court grants a motion styled as a motion to dismiss but bases its ruling on facts developed outside the pleadings, we review the order as an order granting summary judgment"). Appellees do *not* claim error in their Rule 12(b)(6) motion being treated as one for summary judgment. In fact, they agree that, "considering the posture of the pleadings and the plethora of discovery and evidence before the [district court], [their motion to dismiss] was properly considered by the [district court] under the summary judgment standard".

### B.

We review a summary judgment *de novo*, applying the same standard as that used by the district court. *E.g.,* ***Melton v. Teachers Ins. & Annuity Ass'n of America***, 114 F.3d 557, 559 (5th

- 4 -

Cir. 1997).  Under Rule 56, such judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law".  FED. R. CIV. P. 56(c).  We view the pleadings and summary judgment evidence in the light most favorable to the nonmovant.  *Melton*, 114 F.3d at 559. The nonmovant must "make a sufficient showing of an essential element of the case to which [he] has the burden of proof".  *Id.* He "must set forth specific facts to establish that there is a genuine issue for trial, but where the evidential submissions lack probative value as to a genuine issue, summary judgment is appropriate".  *Id.*

In this regard, the substantive law determines what facts are "material".  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party". *Id.; see Capital Concepts Properties 85-1 v. Mutual First, Inc.*, 35 F.3d 170, 174 (5th Cir. 1994).  "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to preclude summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215

(5th Cir. 1998) (quoting **Anderson**, 477 U.S. at 252) (alteration in original).

1.

The § 1983 claim at hand charges violation of Stewart's rights under the Eighth Amendment to the United States Constitution: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted".  Of course, the Amendment does not, by its precise words, mandate a certain level of medical care for prisoners. On the other hand, the "cruel and unusual punishments" clause has been interpreted to mandate the provision of medical care to them.  *E.g.,* **Farmer v. Brennan**, 511 U.S. 825, 832 (1994) ("cruel and unusual punishments" clause imposes duty on prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care").

Along this line, inadequate medical care by a prison doctor can result in a constitutional violation for purposes of a § 1983 claim when that conduct amounts to "deliberate indifference to [the prisoner's] serious medical needs", "constitut[ing] the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment".  **Estelle v. Gamble**, 429 U.S. 97, 104 (1976) (internal citation omitted) (quoting **Gregg v. Georgia**, 428 U.S. 153, 182-83 (1976)).  **Farmer**, 511 U.S. at 837, defined the "deliberate indifference" standard, explaining that a prison official is not liable "unless the official *knows of and disregards*

an excessive risk to inmate health or safety". *Id.* (emphasis added); *see also* ***Bradley v. Puckett***, 157 F.3d 1022, 1025 (5th Cir. 1998).

Therefore, although inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not. ***Mendoza v. Lynaugh***, 989 F.2d 191, 193 (5th Cir. 1993) ("It is clear that negligent medical treatment is not a cognizable basis upon which to predicate a section 1983 action"); ***Williams v. Treen***, 671 F.2d 892, 901 (5th Cir. 1982) ("mere negligence in giving or *failing to supply* medical treatment would not support an action under Section 1983"(emphasis added)); *see also* ***Jackson v. Cain***, 864 F.2d 1235, 1246 (5th Cir. 1989). "Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind." ***McCormick v. Stalder***, 105 F.3d 1059, 1061 (5th Cir. 1997); *see also* ***Bradley***, 157 F.3d at 1025.

The heart of Appellants' claim is that the pattern of neglect by both the facility and the defendant physicians presents a material fact issue for whether the physicians' conduct constitutes deliberate indifference. Specifically, Appellants assert that the doctors' failure to properly treat Stewart's decubitus ulcers, or to transfer him to another facility for intensive physical therapy and other treatment, met this standard. We conclude, however, that Appellants have failed to present a material fact issue because, in

the light of the summary judgment evidence, no reasonable juror could find that the physicians were deliberately indifferent.

The underlying facts concerning the course of Stewart's treatment are largely undisputed. When he was first incarcerated at the prison in May 1993, Stewart was 67 years old and suffered from numerous ailments, including hypertension, arthritis, gout, and heart disease. Restated, Stewart was not a healthy man when he entered prison.

Approximately a year later, Stewart was transferred to the prison disability unit, at which time he was essentially confined to a wheelchair. At some point shortly after his transfer to the disability unit, Stewart became incontinent of bowel and bladder.

a.

Dr. Dial admitted Stewart to the prison hospital on 18 August 1994 to treat grossly swollen legs, which can be indicative of congestive heart failure. After treating this condition for five days, Dr. Dial discharged Stewart to a disability unit. The next day, Dr. Dial was advised that Stewart had a large decubitus ulcer on his lower back. Dr. Dial ordered treatment of the ulcer by cleaning the area with Betadine, applying sugardyne dressing, and placing Stewart on the next sick call.

Although the dissent asserts that Stewart did not receive "even the most rudimentary medicinal functions", Dr. Dial ordered that his wounds be cleansed and treated with antibiotics, and

- 8 -

provided for a follow-up examination.  The dissent may not find this treatment sufficient; but, *at the very least,* it was far more than "rudimentary" medical care.

At worst, any failure by Dr. Dial to discover the ulcer earlier, to read the nurses' notes indicating Stewart's incontinence or mobility problems, or to follow-up to ensure that his orders were carried out might constitute negligence, not the requisite deliberate indifference.

### b.

When Stewart's condition did not improve in the disability unit, he was readmitted to the prison hospital on 6 September 1994, under the care of Dr. Kim.  While Stewart was under her care, Dr. Kim took cultures from the decubitus ulcers, debrided the wounds several times, and administered antibiotics and I.V. fluids.  She ordered that the dressings be changed at least two to three times daily; and that Stewart be repositioned every three hours.  Dr. Kim acknowledges that, due to staffing problems, the nurses sometimes had difficulty following all of the orders.

When the ulcers did not significantly improve, Dr. Kim transferred Stewart to a nearby non-prison hospital for consultation and treatment by a local surgeon, Dr. Wright.  Upon Stewart's return to the prison hospital, Dr. Kim did not follow Dr. Wright's recommendation that Stewart be transferred to another facility to receive, among other things, physical therapy.

Instead, Dr. Kim ordered that Stewart be kept out of bed as much as possible; and that the nurses move his extremities. Because of the seriousness of Stewart's condition, Dr. Kim ultimately transferred Stewart's care to Dr. Knutson.

This evidence does not present a material fact issue for deliberate indifference by Dr. Kim. Even though she did not follow Dr. Wright's recommendations, this suggests nothing more than a difference in opinion as to the appropriate method of treatment under the circumstances. *See* **Norton v. Dimazana**, 122 F.3d 286, 292 (5th Cir. 1997).[1]

In contrast to the charge by the dissent that Stewart was not provided with "even the most rudimentary medicinal functions", Dr. Kim actively treated Stewart's condition. The evidence shows that she personally debrided the ulcers, ordered that the wounds be medicated and dressed, and monitored Stewart's nutritional levels. Further, although the dissent notes that Dr. Kim consulted with Dr. Wright, it fails to mention that she took the additional step of transferring Stewart to another hospital to enable Dr. Wright to examine and treat Stewart and make a recommendation. Again, Dr. Kim ultimately decided not to follow Dr. Wright's advice. In any

---

[1]Although the dissent states that Dr. Kim "disregarded" that advice, Dr. Kim's deposition reflects that she considered Dr. Wright's advice, but chose to take another course of treatment. As noted, this does not present a material fact issue concerning the requisite deliberate indifference.

event, Dr. Kim's active treatment of Stewart is far more than "rudimentary".

Finally, the dissent repeatedly asserts that the doctors are at fault for failing to transfer Stewart to another facility. Dr. Kim specifically addressed this in her deposition, and stated that, in her opinion, Stewart's condition was not serious enough to warrant a transfer to an outside hospital.[2] As noted, the plaintiffs must present a material fact issue regarding Dr. Kim's *deliberate indifference* to Stewart's medical needs; they have not done so.

c.

When Dr. Knutson took over Stewart's care from Dr. Kim, in order to treat the ulcers, he was aware of Dr. Wright's recommendations, but gave no consideration to transferring Stewart to another facility for therapy. Dr. Knutson treated the ulcers with Dakin solution and sugardyne, ordered that the dressings be changed twice daily, and directed that Stewart be repositioned every hour. Additionally, Dr. Knutson periodically checked the wounds and ordered that Stewart get out of bed for extended periods of time. Once more, the treatment provided by Dr. Knutson,

---

[2]The dissent states that the affidavit of Dr. Rothschild (an expert for plaintiffs, but who only reviewed the medical records) reflects a note by Dr. Kim that the prison hospital was inadequate to provide the necessary treatment for Stewart. It is unclear how the dissent came to attribute this statement to Dr. Kim, for in his affidavit, Dr. Rothschild refers only to "the statement of one physician", without further identification.

- 11 -

including orders to clean and medicate the ulcers and reposition Stewart, was more than "rudimentary".

Dr. Knutson testified that he often did not read the nurses' notes, which indicated that Stewart had an infection from a catheter, and he did not prescribe antibiotics.[3] Knutson did not see Stewart during the four day Thanksgiving holiday, and the medical records indicate that Stewart was not seen by a physician during that time.

Dr. Knutson next saw Stewart on 28 November 1994; to the doctor, Stewart "appeared like he was going to die". Dr. Knutson attempted to treat Stewart at the prison facility, but ultimately transferred him to the University of Mississippi Medical Center (UMC) on 30 November 1994.

The attending physician who admitted Stewart to UMC testified that Stewart had the worst bedsores she had ever seen.[4] He died

---

[3]The dissent maintains that Dr. Knutson was deliberately indifferent to Stewart's medical needs in failing to prescribe antibiotics for the catheter infection. However, Dr. Knutson testified that he did not read the nurses' notes and that he was unaware of the possible infection symptoms. Further, Dr. Knutson testified that the symptoms noted by the nurses (pus and a foul odor) were not necessarily symptomatic of an infection. Thus, without evidence that Dr. Knutson *knew* Stewart had an infection and *deliberately* disregarded it, a material fact issue is not presented.

[4]In her deposition, Dr. Schlessinger, the attending physician at UMC who admitted Stewart, affirmatively answered questions whether the lack of antibiotics from November 13 until Stewart was admitted to UMC could have contributed to the spread of the sepsis and whether physical therapy *would* have been "helpful and advisable". At no time during her deposition does she state that

there on 7 December 1994 from sepsis, due to the decubitus ulcers.

Dr. Knutson did not transfer Stewart to another facility for physical therapy, or read the nurses' notes, or administer antibiotics. Again, at worst, these actions might constitute negligence, not the requisite deliberate indifference.

d.

Dr. Russell, the medical director at Parchman, was *not* one of Stewart's treating physicians. His limited contact with Stewart occurred during grand rounds. Dr. Russell testified that he was not informed that the nurses were having difficulty following Dr. Kim's orders.

There is no material fact issue concerning Dr. Russell's understanding that Stewart's ulcers were being treated appropriately. Dr. Russell was aware of the consultation with Dr. Wright, but did not follow up with Dr. Kim concerning Dr. Wright's recommendations. Again, there is no material fact issue as to deliberate indifference.[5]

2.

At oral argument, Appellants' counsel repeatedly referred to evidence that the nurses consistently did not follow doctors'

_____

a combination of antibiotics and physical therapy *would* have prevented Stewart's death.

[5]Because it does not contest our holding with regard to Dr. Russell, we presume the dissent agrees with this portion of the majority opinion.

- 13 -

orders regarding Stewart's treatment; counsel claimed this equated with deliberate indifference. However, Appellants did not sue the nurses; and, of course, the doctors may not be held liable for § 1983 violations under a theory of respondent superior or vicarious liability, based upon claimed omissions by the nurses. *E.g., Monell v. Dept. of Social Servs.*, 436 U.S. 658, 692 (1978); *Simmons v. Cook*, 154 F.3d 805, 808 (5th Cir. 1998) (no respondent superior liability under § 1983); *Eason v. Thaler*, 73 F.3d 1322, 1327 (5th Cir. 1996); *Pierce v. Texas Dept. of Criminal Justice*, 37 F.3d 1146, 1150 (5th Cir. 1994) (no vicarious liability under § 1983); *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Certainly § 1983 does not give a cause of action based on the conduct of subordinates").[6]

---

[6]The dissent does not assert that the doctors are vicariously liable for the actions of the nurses, *per se*. It does assert, however, that the doctors *knew* that the nurses would not be able to carry out the doctors' orders. However, the record does not present a material fact issue on this point. Dr. Dial testified in his deposition that he expected his orders would be carried out. Although Dr. Kim recognized that the nurses sometimes had difficulty carrying out all of her orders, her testimony indicates that she did not perceive the problem to be serious enough as to impede Stewart's treatment at the prison. Finally, Dr. Knutson testified that he expected his orders to be carried out, and that he was not aware that the nurses were having difficulty in following his orders.

Appellants contend that the cumulative claimed acts of negligence by Appellees is sufficient to raise a material fact issue for deliberate indifference. To the contrary, each defendant's subjective deliberate indifference, *vel non*, must be examined separately. *See* **Sellers v. Henman**, 41 F.3d 1100, 1102-03 (7th Cir. 1994) ("The only significance of multiple acts of negligence is that they may be evidence of the magnitude of the risk created by the defendants' conduct and the knowledge of the risk by the defendants").[7]

Again, on this record, the claimed independent acts of negligence by each physician were not sufficient to raise a material fact issue that each doctor *knew* that his acts or omissions subjected Stewart to an excessive risk of harm, yet responded to the risk with deliberate indifference.[8] There is no

---

[7]We do not read the dissent as disagreeing with the proposition that the actions of the doctors must be viewed individually, rather than cumulatively. Rather, the dissent disagrees only with our reasoning regarding the individual acts of the doctors.

[8]The dissent repeatedly asserts that the doctors denied Stewart care that would have saved his life. The only evidence in the record on this point is the earlier-referenced affidavit of Dr. Rothschild, the expert for plaintiffs. After summarizing his review of Stewart's medical records, Dr. Rothschild states: "It is my opinion that the events that ultimately led to Mr. Stewart's demise began in August 1994 if not earlier and that the *records of his care* at Parchman demonstrate that facility was medically incapable or unwilling to properly care for his condition. Such care in my opinion, amounts to an indifference on the part of those in authority to take the action necessary to prevent his death,

probative evidence that the doctors denied, substantially delayed, or intentionally interfered with Stewart's treatment. *Cf.* **Hudson v. McHugh**, 148 F.3d 859, 863-64 (7th Cir. 1998) (jail officers' and nurse's refusal to do anything about prisoner's repeated requests for epilepsy medicine despite knowing he did not have his medicine constituted deliberate indifference to serious medical need). The doctors actively treated Stewart's admittedly serious condition.

---

i.e., to evaluate him in a timely manner and transfer him to a facility where he could receive the necessary care." (Emphasis added.)

It bears repeating that Dr. Rothschild's opinion was based *solely* on his review of medical records. He did not, for example, review the depositions of the defendant doctors. Therefore, his conclusion that the facility was "incapable or unwilling" to provide proper care is of little, if any, probative value. Along this line, he was "awaiting additional documentation", such as those depositions; and, "[u]pon receipt of that information, [he] anticipate[d] supplementing this report". That supplement, if rendered, is *not* in the record.

In any event, the relied upon passage reflects only Dr. Rothschild's opinion that the *cumulative effect* of Stewart's care may have hastened his death. Dr. Rothschild does not identify any particular actions by any of the doctors that constituted *deliberate indifference*; instead, he speaks of "indifference on the part of *those in authority*". (Emphasis added.) As noted, we do not hold that there is no evidence of potentially negligent care. Rather, there is no evidence that creates a material fact issue of whether the doctors *knew* of Stewart's grave condition and were *deliberately indifferent* to it.

Furthermore, contrary to the assertion in the dissent that a transfer to another facility would have saved Stewart's life, Dr. Rothschild's affidavit does not opine that Stewart would have lived if he had been treated at a different facility (based on the doctor's reviewing only the medical records, this is not suprising); and we have found no other evidence in the record stating that Stewart would have lived had he received the treatment the dissent maintains was deliberately denied him.

- 16 -

"Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." **Norton**, 122 F.3d at 292.

At most the evidence was merely colorable on the critical issue of whether the doctors' conduct amounted to deliberate indifference to the treatment of Stewart's decubitus ulcers. Summary judgment for the Appellee physicians was proper, because "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party". **Anderson**, 477 U.S. at 249.

C.

As for Appellants' state law claims, summary judgment was proper, pursuant to **Sparks v. Kim**, 701 So. 2d 1113 (Miss. 1997), which held that prison physicians are protected by qualified immunity for medical treatment decisions, unless "they commit willful wrongs or malicious acts". *See* **id.** at 1116-17 (quoting **Hudson v. Rausa**, 462 So. 2d 689, 696 (Miss. 1984)). As shown *supra*, "[t]he fact that the treatment was inadequate for the severity of [the] condition does not indicate that the doctors in question committed 'willful wrongs or malicious acts'". **Id.** at 1117.[9]

---

[9]The dissent does not address the plaintiff's state law claims. Thus, we presume that it joins the majority opinion on this issue.

## III.

The record simply does not reflect the parade of horrors trumpeted by the dissent — far from it. But, be that as it may, there is no material fact issue to support the requisite deliberate indifference necessary for liability. Accordingly, the judgment for Appellees is

**AFFIRMED.**

*POLITZ, Circuit Judge, dissenting:*

*In the majority's view, Stewart's death was, at worst, the product of mere negligence. If these appellees are guilty of nothing more than a bit of innocuous medical malpractice, then the barrier to a deliberate indifference claim has been rendered virtually impenetrable. I respectfully dissent, as I cannot subscribe to the majority's view of the eighth amendment, effectively rendering its vaunted protections an empty promise.*

*As an unsanitized and uncontested view of the evidence fully demonstrates, appellees -- starkly aware of Stewart's dire condition -- denied him treatment that could have saved his life. Without providing even the most rudimentary of medicinal functions,[10] appellees averted their heads as Stewart slowly and painfully died.*

*There is no question but that Stewart suffered from ill health when he was incarcerated in 1993, and that his health worsened throughout 1994. But it was after a stay in the prison hospital, where he was neither moved nor bathed during a five-day period, that his condition drastically deteriorated. Through what one*

---

[10]The majority insists that, whatever the level of treatment Stewart received, it was more than "rudimentary." Though the majority understandably dislikes this characterization, the facts speak for themselves.

*physician has called "a total lack of observation,"*[11] *Dr. Dial, Stewart's treating physician, overlooked Stewart's skin wounds. Though the nurses' notes clearly stated that Stewart was unable to move and was incontinent of bowel and bladder, he was nonetheless released from the hospital. Dr. Dial did not examine Stewart on the days the nurses made these notations; nor did he review their notes before discharging Stewart. The day after Stewart left the hospital, Dr. Dial received notification that Stewart had developed a twenty-five centimeter stage IV decubitus ulcer -- an advanced-stage bed sore caused by extended periods of immobility -- with necrosis over 95% of its area. Dr. Dial prescribed a treatment of cleansing, dressing, and antibiotics, but he never bothered to confirm that his orders were followed or to check to see whether the treatment was effective.*

*When Stewart was returned to his prison unit, he gave off a foul body odor and feared taking a bath. Because the wheelchair-bound Stewart could not bathe himself, he was forced to rely on his cell-mate who saw that both sides of Stewart's hips were bloody and raw and that his clothes stuck to his body. Although Stewart's cell-mate attempted to clean the wounds, Stewart's wounds -- which emitted a fetid smell and from which there was substantial drainage -- worsened. Stewart became feverish and delirious, lost the ability to control both his bladder and his bowel functions, and*

---

[11]**See** infra at 8.

urinated and defecated on himself. Throughout this period, no physician saw Stewart. The cell-mate signed Stewart in for sick call a number of times but he was not then examined by any medical personnel.

After the passage of two weeks Stewart finally was admitted to the prison hospital by Dr. Kim. On admission, Dr. Kim noted that Stewart had developed multiple decubitus ulcers, including a large ulcer with necrotic tissue on his buttocks and one on his foot. Examination of the ulcers revealed a "very deep infection" and cultures from the ulcers indicated contamination by urine or feces. Dr. Kim ordered that Stewart's dressings be cleaned and changed frequently and that he be repositioned every few hours. But, as Dr. Kim was fully aware, chronic medical understaffing rendered it extremely improbable that Stewart would receive anything like the treatment medically deemed necessary.[12] The dilemma brought on by the dearth of staff was exacerbated because the nurses avoided treating Stewart, whose putrid infections disgusted them. Non-medical personnel drew the task of cleaning and dressing Stewart's wounds to the extent that such occurred.

The necrotic tissue quantity so worsened that Dr. Kim consulted a local surgeon, Dr. Wright, who stressed the need for

---

[12]**See** infra at 8. The majority insists that Dr. Kim simply did not understand the severity of the problem. The record does not bear out this convenient inability by a physician to grasp the seriousness of a situation in which her orders cannot be followed.

*intensive and vigorous physical therapy. This advice was disregarded.[13] Fully aware that the prison hospital lacked the personnel and facilities to implement Dr. Wright's recommendation, Dr. Kim made no effort whatsoever to transfer Stewart to a facility where he could have received this essential care.[14]*

*Instead, Dr. Kim referred Stewart to the care of another prison physician, Dr. Knutson, who continued the same regimen already proven to be totally inadequate to arrest Stewart's deepening infection. At this stage, Dr. Knutson was fully aware that Stewart was arthritic, incontinent, and bed-ridden; his longstanding decubitus ulcers had alarmingly worsened; and he could no longer feed himself. The nurses' notes charted amber, foul-smelling urine and yellow, foul-smelling pus that discharged from Stewart's penis and gathered around Stewart's catheter. Subsequently, the notes alerted, Stewart's bladder became hard and turgid, and his urine became thick and cloudy. The notes also documented repeated complaints by Stewart of a sore throat and*

---

[13]Again, the majority quibbles with my terminology. The record reflects that Dr. Kim received Dr. Wright's advice -- which she herself had procured -- but refused to take any steps to implement his recommendation. She brushed aside his recommendation solely on the ground that Stewart's condition was not "serious" enough to warrant something as basic as physical therapy.

[14]The majority faults me for failing to discuss in more detail the treatment Stewart did receive from Dr. Kim. There is no need for me mention that care, as the majority already assigns more weight to that treatment than it can bear -- the few affirmative steps Dr. Kim took to treat Stewart were woefully deficient.

*widespread pain. According to the notes Stewart, who appeared confused, was moaning and crying. Like Dr. Dial, Dr. Knutson failed to review the nurses' notes.*

*Dr. Knutson thereafter left on a four-day Thanksgiving holiday, during which neither he nor any other physician saw Stewart. When Dr. Knutson returned he observed that Stewart "appeared like he was going to die." While conceding that he believed Stewart had a serious urinary tract infection,[15] Dr. Knutson inexplicably failed to prescribe __any__ antibiotics. Stewart was dehydrated and was not eating; he had become nonresponsive and had multiple abnormalities in lab values. Nonetheless, Dr. Knutson decided against an immediate transfer and delayed two days before transferring Stewart to a proper, readily-available facility. In the meantime, Dr. Knutson took no blood samples to determine Stewart's nutrition levels and took no cultures to ascertain the extent of his infection. Stewart was grossly malnourished and the infection was severe.*

*The treating physician at the transferee facility, Dr. Schlessinger, described Stewart's condition on arrival thusly:*

---

[15]The majority suggests that Dr. Knutson did not know that Stewart was suffering from an infection. His deposition otherwise informs:

Q [Counsel]: So, you think [Stewart has] got a urinary tract infection that's gonna make him die and you don't give him any antibiotics; is that correct?
A [Dr. Knutson]: Correct.
R. 362.

*He was very debilitated. He would open his eyes, but he did not respond to commands. . . He was very dehydrated. . . . I think . . . the most stunning thing was that he was very dry and that he had huge decubitus ulcers. . . . I have lots of patients -- the reason I remember Mr. Stewart so distinctly is that I would say that he had the sad distinction of probably having the worse decubitus ulcers that I had ever seen in my life. He had pressure sores with breakdowns. . . . [O]ne of the hips . . . was really dramatic. You could see exposed bone, lots of necrotic tissue. [The sores] were horrendously foul smelling.*

*Approximately one week after he was admitted Stewart died from sepsis, a toxic condition resulting from infection.*

*The undisputed facts reveal a sad truth. For over three months Stewart lived in agonizing discomfort and pain, slowly approaching death. At least three different physicians could have prevented this painful death by administering a relatively simple course of treatment -- antibiotics and physical therapy. Instead, they looked away as Stewart literally rotted away, his flesh decaying, his body soaked in his own feces, urine, blood, and pus. Even at the final stage, when Stewart's death appeared imminent, a conscious decision was made to postpone his transfer to a hospital for two possibly crucial days.*

*Despite all of this, the majority dismisses the claim that Stewart's prison physicians were deliberately indifferent to his serious medical needs based on appellants' purported failure to show that "the doctors denied, substantially delayed, or intentionally interfered with Stewart's treatment."[16] In my*

---

[16]Slip op. at 15-16.

*judgment, this finding ignores reality.  Dr. Schlessinger testified that Stewart's physicians should have prescribed antibiotics and that they should have ordered an aggressive regime of physical therapy.  After fully reviewing Stewart's medical records, appellants' medical expert -- Dr. Rothschild, Head of the Genetics and Geriatrics Department at the Louisiana State University Medical Center in New Orleans -- agreed with Dr. Schlessinger's conclusion that the care Stewart received fell below the acceptable standard of treatment.[17]  Dr. Rothschild could find <u>no</u> evidence that Stewart <u>ever</u> received appropriate treatment "necessary to deal with his life-threatening condition."[18]  According to Dr. Rothschild, Dr.*

---

[17]The majority dismisses Dr. Rothschild's affidavit as lacking in probative value because he purportedly failed to review the doctors' depositions and planned to (but did not) supplement his affidavit upon review of such additional documentation.  Perhaps Dr. Rothschild reviewed the depositions but declined to modify the affidavit because his conclusions remained the same.  But even if Dr. Rothschild reviewed nothing other than Stewart's medical record, this does not undermine the force of his conclusions for purposes of summary judgment.  As a review of his resume confirms, Dr. Rothschild is an impressively qualified physician.  The question whether to accept his opinion and the weight to be given to it should be reserved for the jury.

[18]Contrary to the majority's assertion and as the following discussion reflects, Dr. Rothschild's affidavit clearly identifies acts committed by Stewart's individual physicians which legally may be classified as "deliberate indifference" -- for instance, the affidavit states that "one physician [acknowledged] that Mr. Stewart [could not] be adequately treated at [the prison] facility," but, despite this acknowledgment, did not transfer Stewart.  The fact that Dr. Rothschild does not use the legal term "deliberate indifference" in cataloguing such acts does not mean that he has failed to identify factual situations that legally amount to deliberate indifference.

*Dial overlooked Stewart's condition and released Stewart -- an enervated, seriously ailing man -- from the hospital only through a "total lack of observation." Further, as Dr. Rothschild observed, hospital records reflect an acknowledgment by Dr. Kim "that Mr. Stewart cannot be adequately treated at this facility because there are simply not enough personnel to provide the intensive care necessary to treat him."[19] The same records note that Stewart's condition was "severe." A review of Stewart's medical files left Dr. Rothschild unable to reconcile "[t]he urgency of the need for adequate care . . . with the apparent lack of available . . . staff . . . to carry out the [physician's] orders." Referring to Dr. Knutson's failure to prescribe antibiotics -- despite evidence of a urological infection of which he was aware -- Dr. Rothschild remarked upon the lack of any "indication of proper . . . management of this condition." The*

---

[19]The majority points out that Dr. Rothschild's affidavit referred to an anonymous physician, not Dr. Kim. This is true, but it is clear that Dr. Rothschild must have been referring to Dr. Kim, since she is the only physician who treated Stewart's decubitus ulcers during the relevant time period and who admitted to an awareness that the prison hospital was not equipped to care for Stewart. If, however, a physician other than Dr. Kim made the statement in the record, that only strengthens my argument -- two doctors, not one, expressly recognized that Stewart would not receive the prescribed treatment so long as he was at the prison facility.

*failure to transfer a dying Stewart out of the prison hospital, Dr.*

*Rothschild suggested, led to his death.[20]*

*In the face of this evidence, I cannot understand the*

*majority's conclusion that appellants failed to show knowledge on*

*the part of each physician "that his [or her] acts or omissions*

*subjected Stewart to an excessive risk of harm."[21] What the record*

*abundantly shows is a failure to undertake even the most basic*

*examination and treatment of a gravely ill patient before releasing*

*him from the prison hospital; a failure to transfer him with full*

*awareness that the prison's facility lacked the means to care for*

*him; and a failure to prescribe sorely needed antibiotics. To me*

*it appears painfully apparent: if a physician knows that a patient*

*will not receive adequate care unless he is transferred, but fails*

*to transfer him to another facility, that physician knows the*

*patient will not receive adequate care. Analogous statements can*

*be made of the physicians' failure to examine and to prescribe*

---

[20]The majority takes issue with this assertion. Dr. Rothschild stated, however, that the care Stewart received "amounts to an indifference on the part of those in authority to take the action necessary to prevent his death, i.e., to evaluate him in a timely manner and transfer him to a facility where he could receive the necessary care."

I read this statement to mean that in order to prevent Stewart's death, it was necessary for appellees to transfer Stewart to a facility where he could receive appropriate care and treatment.

[21]Slip op. at 15.

*antibiotics to a critically ill patient suffering from infection.*

*The majority brushes aside appellees' multiple breaches with the simple observation that doctors cannot be held accountable for deficiencies in the medical staff. This begs the decisive question whether doctors who <u>know</u> their prison staff is incapable of administering the necessary treatment, may, consistent with the eighth amendment, do <u>nothing</u> while a patient languishes unto death for want of treatment in the prison hospital. In my judgment, a doctor who understands that a patient's only prospect of survival depends upon a timely transfer, but does not send that patient to an available hospital, cannot escape liability by pointing to failings of the nursing staff. Contrary to the majority's view, I would not characterize appellees' refusal to transfer Stewart as a mere "difference in opinion as to the appropriate method of treatment under the circumstances."[22] No physician presumed to suggest that the prison facilities provided a viable alternative course of treatment for advanced decubitus ulcers from which Stewart suffered; paper orders that reasonably cannot be implemented should provide no release from accountability. Nor should the failure to prescribe antibiotics in the face of a raging infection reflect a reasonable alternative medical judgment.*

---

[22]Slip op. at 10.

*Under Estelle v. Gamble[23] and Farmer v. Brennan[24] a prisoner establishes deliberate indifference by showing that a prison official "kn[e]w[] of and disregard[ed] an excessive risk to inmate health."[25] If the facts proven by appellants herein do not satisfy that standard, I am forced to the conclusion that under the majority's evaluation no factual scenario ever will.*

*I therefore must dissent.*

---

[23]429 U.S. 97 (1976).

[24]511 U.S. 825 (1994).

[25]**Id.** at 837.