**Electronically Filed
Intermediate Court of Appeals
30233
31-DEC-2013
10:43 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

GREGORY ALLEN SLINGLUFF, Plaintiff-Appellee, vs.
STATE OF HAWAII; STATE OF HAWAII DEPARTMENT OF PUBLIC
SAFETY; HALAWA CORRECTIONAL FACILITY; DR. PATEL; NURSE
MIKE; NURSE BARBARA; DR. ABBRUZZESE; DR. SISAR PADERES,
Defendants-Appellants, and DOE NURSES 1-10; DOE DOCTORS 1-10;
DOE HEALTH CARE PROVIDERS 1-10, AND DOE ENTITIES 1-10, Defendants

NO. 30233

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 06-1-1654)

DECEMBER 31, 2013

NAKAMURA, CHIEF JUDGE, FUJISE AND LEONARD, JJ.

OPINION OF THE COURT BY LEONARD, J.

Defendants-Appellants State of Hawai'i (**State**),

Department of Public Safety (**DPS**), Halawa Correctional Facility

(**HCF**), Dr. Salvatore Abbruzzese (**Dr. Abbruzzese**), and Dr. Sisar

Paderes (**Dr. Paderes**) appeal from the November 12, 2009 Final

Judgment entered by the Circuit Court of the First Circuit

(**Circuit Court**)[1] on, *inter alia*, the Circuit Court's March 12,

---

[1]     The Honorable Victoria S. Marks presided.

2009 order denying Dr. Abbruzzese and Dr. Paderes's motion for summary judgment, and the court's findings of fact (**FOFs**) and conclusions of law (**COLs**), which were entered after a bench trial in this case. In the Final Judgment, the Circuit Court entered judgment in favor of Plaintiff-Appellee Gregory Allen Slingluff (**Slingluff**), with respect to Counts I through IV of Slingluff's Complaint, and against the Defendants-Appellants,[2] relating to Slingluff's claims of negligence on the part of the Defendants-Appellants. The Circuit Court entered judgment in favor of the Defendants-Appellants and against Slingluff on Counts V and VI of Slingluff's complaint, including Slingluff's claims of informed consent and deliberate indifference. The Circuit Court awarded Slingluff $983,395.29, including special damages, general damages, and costs.

In this appeal, Dr. Abbruzzese and Dr. Paderes argue that because they are State-employed physicians, they are shielded from Slingluff's medical malpractice claims by the doctrine of qualified immunity. As discussed below, we hold that physicians employed by the State, including prison doctors, exercising purely medical discretion in the diagnosis and treatment of potentially injured or sick people, are not protected from medical malpractice claims by the doctrine of qualified immunity under Hawai'i law. In this case, although Dr.

---

[2] In the Circuit Court's FOFs, COLs, and Final Judgment, the defendants subject to the court's rulings include the State, DPS, HCF, Dr. Abbruzzese, Dr. Paderes, Dr. Patel, "Nurse Mike," and "Nurse Barbara." However, as discussed below, "Nurse Mike" and "Nurse Barbara" were never served with the complaint and summons. Dr. Patel died during the pendency of the case, and no substitution was made upon his death.

Abbruzzese and Dr. Paderes were exercising professional judgment and discretion, their actions in diagnosing and treating Slingluff were medical, not governmental. Therefore, their actions were not protected by a qualified immunity. In addition, for the reasons set forth herein, we reject the Defendants-Appellants' contention that the Circuit Court clearly erred in finding that their negligence caused Slingluff's infertility.

I.   BACKGROUND

The Circuit Court's FOFs are unchallenged on appeal, except with respect to the cause of Slingluff's loss of fertility. The FOFs are the basis for the following background facts.

In September 2003, Slingluff was residing in the High module of HCF. During this time, a doctor regularly visited the High module of HCF every Tuesday. September 9, 2003, was a Tuesday.

Slingluff testified that, on Thursday, September 11, 2003, he complained about scrotal pain to Dr. Patel but the doctor did not examine him.

On Saturday, September 13, 2003, Slingluff saw a nurse regarding a three centimeter by three centimeter left scrotal abscess. He reported that his scrotal abscess started two days before as a small cyst. He grimaced in pain upon palpitation and was waddling in pain. The nurse contacted Dr. Paderes, who prescribed the antibiotic Keflex.

On Monday, September 15, 2003, Slingluff went to "the

3

gate" within the module for medication. His scrotum, which was red and grapefruit-sized, caused him apparent discomfort. The nurse contacted Dr. Abbruzzese who prescribed a painkiller, Vicodin, and said that he should be seen in the clinic the next day.

On Tuesday, September 16, 2003, Slingluff again went to "the gate" in obvious discomfort. He was seen by Dr. Paderes who ordered him to the infirmary. Slingluff was taken to the infirmary in a wheelchair and started on 500 milligrams of the antibiotic Ancef. He was oozing blood and pus from his infection and again given Vicodin. Slingluff reported that his infection started six days before. That night, a nurse noted that Slingluff's scrotum was "grossly swollen, the size of a very large grapefruit . . . [, he] was pale, appeared in severe pain, and he was limited in his ability to move about." Dr. Saldana then ordered a urological consultation.

On Wednesday, September 17, 2003, Slingluff's scrotum, which was now the size of a melon, was described as "swollen, purplish in color, [and] draining purulent fluid." Slingluff was taken to a urologist's office in a wheelchair where the urologist performed an incision and drainage (**I & D**). A scrotal ultrasound performed at this time indicated that Slingluff's infection was "suspicious of Fournier's gangrene."

Slingluff underwent a total of six surgeries, including the I & D on September 17, 2003. The surgeries subsequent to the I & D included: (1) on September 18, 2003, the "debridement of

his scrotum"; (2) on October 14, 2003, the "debridement of his scrotal area and covering with thigh flaps"; (3) on October 23, 2003, the "debridement of necrotic scrotal flaps and closure of the thigh donor site"; (4) on October 29, 2003, the "debridement of his scrotum, with delayed primary closure"; and (5) on November 14, 2003, the "debridement of the thigh flap." Slingluff remained at Queens Medical Center until November 30, 2003, before returning to HCF.

Slingluff's Complaint includes six counts: (1) Negligent Care and Treatment (Count I); (2) Respondeat Superior and Agency (Count II) ; (3) Breach of Warranties (Count III); (4) Negligent Actions or Inactions (Count IV); (5) Informed Consent (Count V); and (6) Deliberate Indifference (Count VI). As found by the Circuit Count, Counts I through IV are basically medical malpractice claims.

On January 23, 2009, Dr. Abbruzzese and Dr. Paderes moved for summary judgment, arguing that they have qualified immunity from Slingluff's claims. The Circuit Court denied Dr. Abbruzzese and Dr. Paderes's motion on March 10, 2009. The court then conducted a bench trial on Slingluff's claims, hearing testimony and taking evidence from September 1, 2009 through September 4, 2009. The court announced its decision orally on September 17, 2009 and issued its FOFs and COLs, along with the Final Judgment, on November 12, 2009.

The Circuit Court found, *inter alia*, that on September 13, 2003, "the proper dose of antibiotic was not given and this

5

fell below the applicable standard of care." The choice of antibiotic, however, "did not fall below the standard of care." The Circuit Court also found that Slingluff "should have been seen before September 15, 2003, or at the latest September 16, 2003, for an [I & D] of the abscess, and that delay in treatment fell below the standard of care." The Circuit Court further found that both the prescription of Ancef on September 16 and 17, 2003, and the dose it was prescribed in, fell below the applicable standard of care and that the antibiotic should have been changed to a "different group or family when it was apparent that the original antibiotic was not working."

The Circuit Court ultimately found that the Defendants-Appellants' negligence was "the direct and proximate cause of Plaintiff's injuries and damages." The Circuit Court further found, *inter alia*, that as a result of the Defendants-Appellants' negligence, Slingluff suffered damages of "six surgeries . . . , amputation of his scrotal sac, multiple skin grafts . . . , hospitalization for two months, infertility, loss of production of male hormones, painful sexual erections," that Slingluff will further suffer future damages from the surgical removal of his skin tabs and surgical reconstruction "in order to get testicular function back," and that Slingluff has suffered lost earnings, and will suffer future lost earnings, as well as future medical costs.

As a result of the injuries caused by the Defendants-Appellants' negligence (Counts I through IV), Slingluff was

awarded $306,188 for "the present value of Plaintiff's past and future lost earnings," and $326,712 for "the present value of Plaintiff's future medical costs." Slingluff was also awarded $300,000 for his "past and future pain and suffering, mental anguish and disfigurement." Finally, the Circuit Court also awarded Slingluff $50,495.29 after granting Slingluff's motion for taxation of costs.

The Circuit Court entered judgment in favor of Defendants-Appellants on Count V because Slingluff "failed to prove, by a preponderance of the evidence, this count of the Complaint." The Circuit Court also entered judgment in favor of Defendants-Appellants' on Count VI because the Defendants-Appellants "did not intentionally ignore or maliciously ignore [Slingluff]."

Defendants-Appellants timely filed an appeal.

II. POINTS OF ERROR

Defendants-Appellants raise the following points of error: (1) the Circuit Court erred by denying Dr. Abbruzzese and Dr. Paderes's motion for summary judgment on the grounds of qualified immunity; and (2) the Circuit Court erred by finding that Defendants-Appellants caused Slingluff's loss of fertility. Although not raised as a point of error, Defendants-Appellants also argue that the Circuit Court mistakenly entered judgment

7

against certain non-parties, who were identified as Dr. Patel, "Nurse Mike," and "Nurse Barbara."[3]

III. APPLICABLE STANDARDS OF REVIEW

An appellate court reviews "the circuit court's grant or denial of summary judgment *de novo*." Querubin v. Thronas, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (citation omitted).

FOFs are reviewed under the clearly erroneous standard. Bhakta v. Cnty. of Maui, 109 Hawai'i 198, 208, 124 P.3d 943, 953 (2005). "An FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made." Schiller v. Schiller, 120 Hawai'i 283, 288, 205 P.3d 548, 553 (App. 2009) (citations, internal quotation marks, and brackets omitted). "Substantial evidence" is defined as "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Inoue v. Inoue, 118 Hawai'i 86, 92-93, 185 P.3d 834, 840-41 (App. 2008) (citations and internal quotation marks omitted).

> A COL is not binding upon an appellate court and is freely reviewable for its correctness. [The appellate] court ordinarily reviews COLs under the right/wrong

---

[3] Defendants-Appellants' points of error are woefully noncompliant with Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b)(4), and, although argued by appellants and agreed to by Slingluff, the third issue is not even identified in the points of error. Such omissions may result in points of error being disregarded. However, in the interest of justice, we have exercised our discretion to address the merits of the appeal. O'Connor v. Diocese of Honolulu, 77 Hawai'i 383, 386 n.5, 885 P.2d 361, 364 n.5 (1994); Sprague v. Cal. Pac. Bankers & Ins. Ltd., 102 Hawai'i 189, 196, 74 P.3d 12, 19 (2003).

> standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned. However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

Chun v. Bd. of Trs. of Emps.' Ret. Sys. of State of Haw., 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005) (citations, internal quotation marks, and brackets in original omitted) (quoting Allstate Ins. Co. v. Ponce, 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004)).

The Hawai'i Supreme Court, in Okada Trucking Co., Ltd., v. Bd. of Water Supply, stated the following regarding plain error:

> [T]he plain error doctrine represents a departure from the normal rules of waiver that govern appellate review, and, as such, [] an appellate court should invoke the plain error doctrine in civil cases only when justice so requires. As such, the appellate court's discretion to address plain error is always to be exercised sparingly. And, indeed, in civil cases, we have taken three factors into account in deciding whether our discretionary power to notice plain error ought to be exercised: (1) whether consideration of the issue not raised at trial requires additional facts; (2) whether its resolution will affect the integrity of the trial court's findings of fact; and (3) whether the issue is of great public import.

97 Hawai'i 450, 458, 40 P.3d 73, 81 (2002) (citations, internal quotation marks, ellipsis, and original brackets omitted; format altered).

IV.   DISCUSSION

A.   Whether State Prison Doctors Are Immune from Suit

Dr. Abbruzzese and Dr. Paderes argue that the Circuit Court erred by rejecting their argument that, in their individual capacities, they were protected from liability by qualified immunity.

9

Hawai'i appellate courts have recognized a limited immunity protecting *government officials* from being sued in their individual capacities. See, e.g., Towse v. State, 64 Haw. 624, 631-32, 647 P.2d 696, 702 (1982). The Towse plaintiffs were comprised of prison guards and their wives who brought action against state officials for defamation, false imprisonment, and loss of consortium. Id. at 625, 647 P.2d at 698. The court held that the defendants were not liable for their *comments*[4] because "non-judicial governmental officials, when acting in the performance of their public duty, enjoy the protection of what has been termed a qualified or conditional privilege." Id. at 631-32, 647 P.2d at 702. Quoting the United States Supreme Court, the supreme court reasoned that:

> [O]fficials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties-suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration [of] policies of government.

Towse, 64 Haw. at 631 n.8, 647 P.2d at 702 n.8 (quoting Barr v. Matteo, 360 U.S. 564, 571 (1959)); see also Medeiros v. Kondo, 55 Haw. 499, 504, 522 P.2d 1269, 1272 (1974) (**Kondo**) ("We hold that the best way to balance the interests of the maliciously injured party against the innocent official is to allow the action to proceed but to limit liability to only the most guilty of officials by holding plaintiff to a higher standard of proof than

---

[4] Notably, the false imprisonment and loss of consortium claims were determined on grounds unrelated to the question of qualified immunity. See Towse, 64 Haw. at 634-36, 647 P.2d at 704-05.

in a normal tort case. To this end we allocate to plaintiff the burden of adducing clear and convincing proof that defendant was motivated by malice and not by an otherwise proper purpose.").

It is undisputed that Dr. Abbruzzese and Dr. Paderes were *employees* of the State, carrying out the duties they were employed to perform, when the negligence occurred.[5] However, no Hawai'i case has held (or examined) whether a doctor, by virtue of employment by the State, is shielded from liability for his or her medical malpractice by the doctrine of qualified immunity for *government officials* that was promulgated in Towse. For the reasons discussed below, we conclude that physicians employed by the State, specifically including prison doctors, are not shielded from personal liability for medical malpractice claims by the doctrine of qualified immunity.

The Hawai'i Supreme Court initially crafted the position that non-judicial governmental officers enjoy qualified, rather than absolute, immunity for their tortious acts in Kondo. Towse, 64 Haw. at 630, 647 P.2d at 701. The rationale for this jurisprudence was the court's "desire to effectuate a balance between the interest of a maliciously injured plaintiff and a good faith public official." Id. Presently, the State seeks to focus attention on the "*maliciously* injured" aspect of this doctrine, but it is critical that we focus first on who was

_____

[5] On appeal, Defendants-Appellants do not challenge or dispute the trial court's findings and conclusions establishing that their negligence, or medical malpractice, proximately caused injuries and damages suffered by Slingluff, although they do dispute that the resulting injuries include Slingluff's infertility.

considered a "public official" or "government officer" in the development of this rule. As noted above, in <u>Towse</u>, the Hawai'i court quoted the United States Supreme Court's explanation in <u>Barr</u> for protection of "responsible governmental officers:"[6]

> The reasons for the recognition of the privilege have been often stated. It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties-suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and **effective administration [of] policies of government**.

<u>Id.</u> n.8 (quoting <u>Barr</u>, 360 U.S. at 571) (emphasis added).

The preceding passage in <u>Barr</u>, a quotation from a prior Supreme Court case, illuminates the crux of the role of the governmental officer that is sought to be protected:

> In exercising the functions of his office, the head of an executive department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. **It would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch of the government, if he was subjected to any such restraint.** He may have legal authority to act, but he may have such large discretion in the premises that it will not always be his absolute duty to exercise the authority with which he is invested. But if he acts, having authority, his conduct cannot be made the foundation of a suit against him personally for damages, even if the circumstances show that he is not disagreeably impressed by the fact that his action injuriously affects the claims of particular individuals.

<u>Barr</u>, 360 U.S. at 570 (emphasis added; citation, footnote, and internal quotation marks omitted).

---

[6] Our reference to the term "responsible governmental officers" is taken from <u>Barr</u>, 360 U.S. at 565. In that case, the responsible government officer in question was the acting director of a federal agency who had been sued for libel by former employees of that agency as a result of a press release issued at the acting director's direction. <u>Id.</u>

The question addressed by the Supreme Court in <u>Barr</u> was whether the protections given to high officials, *i.e.*, "executive officers of cabinet rank," should be extended to other government officials who set and carry out governmental policies, while acting within the scope of his or her powers as a government official. <u>Id.</u> at 572. Answering this query in the affirmative, the Supreme Court made clear that the act of governing - not the mere fact of government employment - was the properly protected activity:

> We do not think that the principle announced in <u>Vilas</u> can properly be restricted to executive officers of cabinet rank, and in fact it never has been so restricted by the lower federal courts. The privilege is not a badge or emolument of exalted office, but **an expression of a policy designed to aid in the effective functioning of government.** The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy.

> To be sure, the occasions upon which the acts of the head of an executive department will be protected by the privilege are doubtless far broader than in the case of an officer with less sweeping functions. But that is because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails. It is not the title of his office but **the duties with which the particular officer sought to be made to respond in damages is entrusted -the relation of the act complained of to 'matters committed by law to his control or supervision,'** -which **must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity** from civil defamation suits.

<u>Barr</u>, 360 U.S. at 572-74 (emphasis added; citations, footnotes, and internal quotation marks omitted).

Although the Hawai'i Supreme Court has struck a different balance, opting for qualified immunity rather than absolute immunity, it is clear that this jurisprudence was

13

intended to protect actions taken by government officials in furtherance of governing. In Kondo, the supreme court adopted Judge Learned Hand's characterization of the "immunity problem":

> It does indeed go without saying that **an official**, who is in fact guilty of **using his powers** to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the order of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative.
>
> Although **we agree with Judge Hand's conception of the problem** we disagree with his conclusion of complete immunity.

Kondo, 55 Haw. at 501, 522 P.2d at 1270 (emphasis added; citation omitted).[7] Thus, the primary purpose of immunity is to ensure

---

[7] See also Runnels v. Okamoto, 56 Haw. 1, 4-5, 525 P.2d 1125, 1128-29 (1974), another defamation action in which the court addressed the issue of who is entitled to qualified immunity:

> We find the rule of law enunciated earlier this term by this court in Medeiros v. Kondo, 55 Haw. [499], 522 P.2d 1269 (1974) controlling and dispositive on the issues here presented.
>   . . . .
> This greater burden of proof requirement [announced in Kondo] is applicable to lawsuits against those officials who were formerly within the parameters of Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). Defendants Okamoto and Heen fall into this category. Defendant Heen was an elected councilman for the City and County of Honolulu. Defendant Okamoto was the city council auditor who was charged with the overall responsibility for directing the

(continued...)

14

that public officers and employees are not "unduly hampered, deterred and intimidated in the discharge of their duties" by the threat of lawsuits. 63C AM. JUR. 2D Public Officers and Employees § 298 (2009) (footnote omitted). It seeks to avoid making public officials "unduly fearful in their exercise of authority" and to avoid "discourag[ing] them from taking prompt and decisive action." George A. Bermann, Integrating Governmental and Officer Tort Liability, 77 COLUM. L. REV. 1175, 1178 (1977) (footnote omitted).

In considering whether physicians employed by the State to diagnose and treat potentially injured or sick persons, in this case prison doctors who treated an inmate suffering from a serious infection, are entitled to the immunities granted to the governmental officers identified in Towse, Kondo, and Barr, we conclude that the exercise of purely medical judgment is not entitled to the shield of qualified immunity. In short, although Dr. Abbruzzese and Dr. Paderes were exercising professional judgment and discretion, their actions in conjunction with the diagnosis and treatment of Slingluff were medical, not governmental. No public affairs, public planning, policy-making,

7/(...continued)
post-audit, the fiscal, budgetary and management analyses, and the general research programs in behalf of the city council. Her duties included analyzing budgetary requests, budget management and controls, and management compliance of city council approved programs. She was the adviser to the city council on fiscal matters and performed other related duties as required. Guided by the general policies of the city council, she possessed a wide range of discretion in carrying out the functions of her office.

public duty, or *governmental* discretion were involved. Rather, in this medical malpractice case, the issues involve: (a) the appropriate standard of medical care; (b) whether a defendant-physician's conduct fell below such standard; and (c) whether such conduct was the legal cause of plaintiff's injury. See Craft v. Peebles, 78 Hawai'i 287, 299, 893 P.2d 138, 150 (1995).

Many courts in other jurisdictions have similarly held that state-employed physicians working at public hospitals, clinics, and other non-correctional facilities are not entitled to official immunity. See, e.g., Davis v. Knud-Hansen Mem'l Hosp., 635 F.2d 179, 187-88 (3d Cir. 1980); Jackson v. Kelly, 557 F.2d 735, 738-39 (10th Cir. 1977); Henderson v. Bluemink, 511 F.2d 399, 402-03 (D.C. Cir. 1974); Ex parte Cranman, 792 So.2d 392, 403-06 (Ala. 2000); Jinkins v. Lee, 807 N.E.2d 411, 420-21 (Ill. 2004); Gould v. O'Bannon, 770 S.W.2d 220, 221-22 (Ky. 1989); Kelley v. Rossi, 481 N.E.2d 1340, 1344 n.6 (Mass. 1985); Terwilliger v. Hennepin Cnty., 561 N.W.2d 909, 913-14 (Minn. 1997); Kassen v. Hatley, 887 S.W.2d 4, 9-12 (Tex. 1994), superseded by statute as recognized in Franka v. Velasquez, 332 S.W.3d 367, 381-85 (Tex. 2011); James v. Jane, 282 S.E.2d 864, 867-70 (Va. 1980). We recognize, however, that among the relatively few cases addressing prison physicians, there is a divergence of opinions as to whether immunity applies. See Ross v. Schackel, 920 P.2d 1159, 1165 n.5 (Utah 1996) (recognizing a "split of authority on this issue"). Those jurisdictions granting immunity to prison physicians have generally done so on

the basis of two rationales: (1) a literal interpretation of the "discretionary function" analysis applied in many immunity cases; and (2) the policy considerations relative to the unique prison environment.

In adopting the first rationale for granting immunity to prison physicians, several courts have relied, in whole or in part, upon a literal interpretation of the term "discretionary" without regard to the underlying purpose of official immunity. See Cantrell v. Thurman, 499 S.E.2d 416, 421 (Ga. Ct. App. 1998); Gillam v. Lloyd, 432 N.W.2d 356, 365-66 (Mich. Ct. App. 1988); Ross, 920 P.2d at 1164-65. They reason that because medical treatment and diagnosis involve discretionary skills and independent judgment, they constitute discretionary functions. Cantrell, 499 S.E.2d at 421 (stating that "the determination of what medical treatment to provide is an act of discretion subject to official immunity") (citation and emphasis omitted); Gillam, 432 N.W.2d at 365 (stating that "medical decisionmaking is inherently discretionary" (citation omitted)); Ross, 920 P.2d at 1165 (stating that "a great deal of judgment and opinion are involved in making a diagnosis and prescribing appropriate medical treatment").

We conclude, however, that this approach is flawed in several respects. First, it obscures the difference between *medical* discretion and *governmental* discretion. In so doing, it vitiates the policy reasons justifying official immunity and the delicate balance it seeks to preserve. As physicians are held to

an independent standard of conduct (namely, that governing the medical profession), denying them immunity for medical malpractice would not hinder the execution of their duties. On the contrary, granting prison physicians immunity would undermine their adherence to professional standards. Furthermore, as we concluded above, medical judgment is not the type of governmental discretion entitled to protection under the official immunity doctrine. See also Ross, 920 P.2d at 1173 (Stewart, C.J., dissenting) ("There is nothing whatsoever about the rendition of medical treatment that involves governmental decision-making."). Nor does a separation-of-powers rationale support extending immunity to physicians, as their exercise of medical discretion does not implicate the independence of coordinate branches of government. Thus, a literal application of the discretionary function requirement "far exceeds what is necessary or reasonable to further" the policies justifying official immunity. Id. at 1172 (Stewart, C.J., dissenting).

We also reject the second rationale for generally extending immunity to prison doctors.[8] Several courts have

---

[8] As this is a "classic" medical malpractice case, we do not reach the question of whether there might be some circumstances in which a State-employed physician, including a prison doctor, would be entitled to qualified immunity. See, e.g., Kassen, 887 S.W.2d at 9-11 (concerning physicians in a public hospital), and Jolly, 923 F. Supp. at 948-50 (applying Kassen to prison physicians). Texas courts adopted a middle ground, recognizing the distinction between governmental and medical discretion, while at the same time recognizing the constraints unique to government employment. In Kassen, the court recognized that state-employed physicians encounter concerns that are absent in the private sector. 887 S.W.2d at 10. For example, they may face constraints arising from compulsory medical care, policy-making and administrative responsibilities, and the necessities of conserving public resources. Id. These constraints are often magnified in the prison context. Jolly, 923 F. Supp. at 949. Thus, Kassen held that where prison physicians

(continued...)

reasoned that the policy considerations unique to the prison environment justify granting immunity to prison medical personnel. <u>Schmidt v. Adams</u>, 438 S.E.2d 659, 660 (Ga. Ct. App. 1993) (reasoning that prison physicians serve "the governmental function of caring for persons confined in the jail"); <u>Sparks v. Kim</u>, 701 So.2d 1113, 1115-16 (Miss. 1997); <u>Ross</u>, 920 P.2d at 1165-66.

In <u>Sparks</u>, the Mississippi Supreme Court outlined the factors that distinguish prison physicians from those practicing in public hospitals and clinics, for whom prior case law had denied immunity. 701 So.2d at 1115-16. First, it reasoned that "[t]he medical treatment afforded to prisoners involves governmental and public policy considerations to a greater degree than similar treatment issues involving non-inmates." <u>Id.</u> at 1115. Inmates are not only patients, but "security risks whose treatment also involves considerations unrelated to medical

---

<sup>8/</sup>(...continued)
exercise *governmental* discretion, they are entitled to official immunity. <u>Id.</u> at 949-50; <u>Kassen</u>, 887 S.W.2d at 10-11. On the other hand, the court concluded that where state-employed physicians exercise purely *medical* discretion (as in the diagnosis and treatment of patients), the purpose of official immunity no longer applies. <u>See Kassen</u>, 887 S.W.2d at 10-11. A physician's exercise of purely medical discretion thus does not warrant official immunity. In 2003, the Texas Legislature superseded <u>Kassen</u> by extending official immunity to all employees acting within the scope of their employment. Tex. Civ. Prac. & Rem. Code Ann. § 101.106 (West 2013); <u>see</u> <u>Franka</u>, 332 S.W.3d at 381-85 (recognizing abrogation of <u>Kassen</u>). Prior to its abrogation, several commentators advocated <u>Kassen</u> as the most well-reasoned and logically consistent approach toward applying the policies and purposes of official immunity. <u>See</u>, <u>e.g.</u>, Paxton R. Guymon, <u>Utah Prison Physicians: Can They Commit Malpractice with Impunity or Does Their Official Immunity Violate the Open Courts Clause?</u>, 1997 UTAH L. REV. at 873, 895-97 (1997) (noting that <u>Kassen</u> "struck a remarkable balance" between conflicting policies); Chad O. Propst, <u>Dethroning Gould v. O'Bannon: A Lone Star State Solution for Qualified Official Immunity Cases Involving Government-Employed Medical Professionals in the Bluegrass State</u>, 48 U. LOUISVILLE L. REV. at 351, 373-84 (2009).

necessities." Id. Their medical needs must be weighed against concerns regarding prison administration, security, and limited public resources. Id. Second, denying immunity to prison physicians would have an adverse affect on the state's ability to hire competent medical personnel, as prisons "clearly do[] not offer the most desirable working environment for a doctor." Id. at 1116. Third, the court was reluctant to "grant[] inmates access to yet another outlet for the exercise of creative litigation." Id. It opined that prison physicians were at greater risk for vexatious litigation than those employed elsewhere in the public and private sectors. Id.

Similarly, in Ross, the Utah Supreme Court reasoned that "[t]here is a vast difference between the operation of a state-owned hospital, where patients are voluntarily admitted as they are at private hospitals, and the operation of a prison, where its residents are kept involuntarily and the state must provide for their every need." 920 P.2d at 1165 n.6. Unlike physicians in public hospitals, the official duties of prison physicians "are integral to the performance of a uniquely governmental function." Id. at 1165.

The dissenting opinions in Sparks and Ross set forth the flaws detracting from these rationales. In both cases, the dissenters decried the practical effect of the majority opinions as sanctioning a lower standard of medical care for prisoners. See Sparks, 701 So.2d at 1117 (McRae, J., dissenting), 1120 (Banks, J., dissenting in part); Ross, 920 P.2d at 1168 (Stewart,

C.J., dissenting) ("The majority holds that . . . . incarcerated persons are not entitled to competent medical treatment."). They reasoned that "[d]octors, like attorneys and other medical personnel who serve the prison population, are expected to exercise the same level of professional care as those who serve the general population." Sparks, 701 So.2d at 1118 (McRae, J., dissenting); see Ross, 920 P.2d at 1174-75 (Stewart, C.J., dissenting) ("state health care professionals owe their patients the same duty that private medical professionals owe theirs"). Providing immunity for medical malpractice of prison physicians effectively denies prisoners "reasonable, competent medical care." Ross, 920 P.2d at 1168 (Stewart, C.J., dissenting).

The dissenters also criticized the conclusion that concerns for security or prison administration could color purely *medical* decisions to such a great extent as to require immunity. Sparks, 701 So.2d at 1118 (McRae, J., dissenting); Ross, 920 P.2d at 1171 (Stewart, C.J., dissenting) ("The majority does not explain how requiring a doctor to meet accepted standards of medical care in diagnosing and treating a patient can adversely affect prison discipline."). To the extent that medical decisions are "always affected by the conditions attendant to the patient's environment," professional standards are adequate to take those conditions into account. Sparks, 701 So.2d at 1120-21 (Banks, J., dissenting in part).

Finally, the dissenters observed that affording immunity for medical discretion abrogates the fundamental purpose

of official immunity: to preclude liability only "where necessary to protect the government's capacity to perform its traditional functions." Id. at 1121 (Banks, J., dissenting in part); see Ross, 920 P.2d at 1172 (Stewart, C.J., dissenting). Medical discretion is simply "not the sort of individual judgment sought to be protected by the qualified immunity bestowed upon public officials." Sparks, 701 So.2d at 1118 (McRae, J., dissenting) (citation omitted). Fostering a lower standard of medical care among prison physicians "is clearly not necessary, let alone effective, in promoting a rational prison objective." Ross, 920 P.2d at 1176 (Stewart, C.J., dissenting) (citations omitted).

Other courts have echoed these sentiments in denying official immunity to prison physicians. See, e.g., U.S. ex rel. Fear v. Rundle, 506 F.2d 331, 335-36 (3d Cir. 1974); Smith v. Franklin Cnty., 227 F. Supp. 2d 667, 681 (E.D. Ky. 2002); Jolly v. Klein, 923 F. Supp. 931, 949-50 (S.D. Tex. 1996) (applying Texas law); Madden, 372 N.E.2d at 1134-35; Cooper v. Bowers, 706 S.W.2d 542, 543 (Mo. Ct. App. 1986). These courts recognize that medical professionals owe the same duties of professional care to prison inmates as they do to any other patient. See Smith, 227 F. Supp. 2d at 681; Jolly, 923 F. Supp. at 949; Cooper, 706 S.W.2d at 543 ("The [prison] physician provides the same services to patients in state institutions as he does in practice in the private sector."). Such duties, unlike most other discretionary functions, do not arise "solely by virtue of holding a public

22

office." Madden, 372 N.E.2d at 1134 (citations omitted). Allowing prison physicians immunity for medical malpractice does not "promote smooth and effective government." See Cooper, 706 S.W.2d at 543 (citation and internal quotation marks omitted); see also Madden, 372 N.E.2d at 1135 ("There is nothing unduly burdensome in holding that [prison physicians] owe inmates whom they treat the same duty of care which they owe their patients in private practice."). We agree. Prisoners should not be denied recovery "for the sole reason that the doctor or nurse is a government employee." Jolly, 923 F. Supp. at 949 (citation and internal quotation marks omitted).

In the case now before this court, the Circuit Court found, *inter alia*, that the defendant physicians were negligent in: (1) failing to promptly treat Slingluff in order to apply I & D treatment to the abscess, and that the delay in treatment fell below the standard of care; (2) prescribing the wrong dosage of antibiotic; and (3) failing to prescribe a different antibiotic when it became apparent that the original antibiotic was not working. These findings all pertain to the exercise of purely *medical* discretion because they involved strictly medical diagnosis and treatment. The decisions made did not involve policy making or any other type of governmental discretion. As a result, Dr. Abbruzzese and Dr. Paderes are not entitled to qualified immunity, and the Circuit Court did not err when it denied their motion for summary judgment.

B.    Findings re Loss of Fertility

Defendants-Appellants contend that the Circuit Court clearly erred in finding that their negligence caused Slingluff's infertility.  They argue that Slingluff's "shifting and inconsistent testimony, coupled with the expert testimony" pushes the Circuit Court's FOFs into the realm of plain error.  Defendants-Appellants request that the FOFs regarding Slingluff's fertility be vacated and that the damages awarded to Slingluff be amended to exclude compensation for his infertility.

Because the Circuit Court's determination of the cause of Slingluff's infertility is a factual finding, we may only overturn it if the Circuit Court clearly erred.  Bhakta, 109 Hawaiʻi at 208, 124 P.3d at 953.  An FOF is clearly erroneous if it is unsupported by substantial evidence in the record or the appellate court is "left with a definite and firm conviction that a mistake has been made."  Id.

In the present case, when asked whether "the scrotal abscess that [Slingluff] had in September of '03 was a substantial factor that contributed to his infertility," Dr. Herbert Chinn (**Dr. Chinn**), Defendants-Appellants' expert urologist, replied that, "[i]t would seem that this infection played a significant role."  Also, in his report, Dr. Chinn wrote that, "it is difficult to state without a doubt that his infertility is related directly to the infection or subsequent care provided[, but c]ertainly the circumstances suggest a relationship to the events, however."

24

The testimony and medical reports of Dr. Joseph Schmidt (**Dr. Schmidt**), Slingluff's expert urologist, also support the finding that Slingluff's infertility was caused by Defendants-Appellants' negligence. Dr. Schmidt testified that there were three different mechanisms stemming from Slingluff's infection and treatment that could have caused his infertility. Dr. Schmidt explained that: (1) "he had a massive infection which, as I said, required multiple removal of dead tissue and skin grafts and repositioning of his testes"; (2) "[h]e had epididymitis . . . [t]hat's the inflamation of the gland that stores the sperm next to the testes [-- a]nd that was on both sides"; (3) "the multiple surgeries themselves run the risk of impairing the blood flow to the - to the testes." In his medical reports, Dr. Schmidt wrote that Slingluff's infertility likely resulted "from his episode of Fournier's gangrene and the resulting surgical treatments." Dr. Schmidt also wrote, *inter alia*, that Slingluff's presentation on September 15, and 16, 2003, "warranted immediate referral to a urologist and appropriate treatment" that would have prevented "the extensive scrotal resection required on September 18, 2003, which caused amputation of his scrotal sac, infertility, and loss of production of male hormones."

Defendants-Appellants argue that Slingluff never took a fertility test before the onset of his infection, and that his admitted drug and alcohol abuse could have also caused his low sperm count. Although Defendants-Appellants offer a different,

possible cause of Slingluff's infertility, the Circuit Court acted within its exclusive province as fact-finder in reconciling conflicting testimony. State v. Jenkins, 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000). Here, the testimonies and medical reports of multiple expert witnesses provided substantial evidence in support of the Circuit Court's FOFs. As such, we conclude that the Circuit Court did not err in finding that Defendants-Appellants caused Slingluff's infertility.

C.   The Additional Defendants

Defendants-Appellants argue, and Slingluff agrees, that Final Judgment entered in favor of Slingluff and against Defendants-Appellants improperly included Dr. Patel, "Nurse Mike," and "Nurse Barbara" among the Defendants-Appellants. Defendants-Appellants have no standing to raise this issue on appeal because, inter alia, they are not aggrieved by the ruling. See, e.g., Abaya v. Mantell, 112 Hawai'i 176, 181, 145 P.3d 719, 724 (2006) (identifying requirements of standing to appeal). Nevertheless, appellate courts "have the power, sua sponte, to notice plain errors or defects in the record affecting substantial rights [though they were] not properly brought to the attention of the trial judge or raised on appeal." State v. Iaukea, 56 Haw. 343, 355, 537 P.2d 724, 733 (1975) (citations omitted).

Dr. Patel was served with process on September 28, 2006, but passed away on July 28, 2007, during the pendency of

this action.  Hawai'i Rules of Civil Procedure (**HRCP**) Rule 25(a)(1) states:

> If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties.  The motion for substitution may be made by any party or by the successors or representatives of the deceased party . . . .  Unless the motion for substitution is made not later than 120 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.

A suggestion of death upon the record was entered on August 16, 2007.  Slingluff did not file a motion for substitution within 120 days after the suggestion was entered (or at anytime thereafter).  As a result, pursuant to HRCP Rule 25(a)(1), the present action must be dismissed as to Dr. Patel.

Slingluff acknowledges, and the record confirms, that "Nurse Mike" and "Nurse Barbara" were never served with process of any kind in this case.  Even assuming that they could be properly identified, the entry of judgment against them is inconsistent with the most basic requirements of due process of law and is therefore void.  See generally, City Bank v. Abad, 106 Hawai'i 406, 411, 105 P.3d 1212, 1217 (App. 2005).

Accordingly, we recognize plain error in this case and reverse the Final Judgment entered against Dr. Patel, "Nurse Mike," and "Nurse Barbara."

V.   CONCLUSION

For these reasons, we reverse the Circuit Court's November 12, 2009 Final Judgment, in part, with respect to the

claims against Dr. Patel, "Nurse Mike," and "Nurse Barbara."  In all other respects, we affirm.

DATED:  Honolulu, Hawai'i, December 31, 2013.

Kendall H. Moser,
Deputy Attorney General,
(Mark J. Bennett, Attorney General,
and Caron M. Inagaki, Deputy
Attorney General, with her
on the briefs)
for Defendants-Appellants.

Richard Turbin and
Janice D. Heidt
(Rai Saint Chu and
Francis L. Jung with
them on the briefs)
for Plaintiff-Appellee.